**Case No. 25-2738**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al*.,

*Respondents*.

---

Petition for Review of Final Administrative Action
of the United States Environmental Protection Agency

---

# PETITIONER'S OPENING BRIEF

---

Allison LaPlante
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
T: (503) 980-3408

Hannah Connor
Benjamin Rankin
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
T: (202) 681-1676

*Attorneys for Petitioner*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ....... 1

JURISDICTIONAL STATEMENT ....... 2

STANDARD OF REVIEW ....... 5

ISSUES PRESENTED ....... 6

STATEMENT REGARDING ADDENDUM ....... 6

STATEMENT OF THE CASE ....... 6

I. Pesticides Present Significant Dangers to Imperiled Species and People ....... 6

II. Legal Background and EPA's History of Failure to Properly Regulate Pesticide Discharges Under the Clean Water Act ....... 12

A. The Clean Water Act and NPDES Program ....... 12

B. History of Pesticide Regulation and Litigation ....... 16

C. ESA Consultation and this Permit ....... 19

SUMMARY OF THE ARGUMENT ....... 21

ARGUMENT ....... 23

I. The Permit's Nearly Universal NOI Exemption Is Arbitrary, Capricious, and Inconsistent with the Clean Water Act ....... 23

A. The Permit Unlawfully Exempts Most Pesticide Dischargers from Basic Notice Obligations ....... 24

B. EPA Has Not Met its Burden to Establish the NOI Exemption Under § 122.28(b)(2)(v) ....... 29

C. The Permit Fails to Rationally Address the Services' Serious Concern ....... 35

D. EPA's Lack of NOI Submissions Is Compounded by the Minimal Requirements for those who Do Submit NOIs ..............................38

II. The Permit Violates the Clean Water Act and EPA's Regulations Because it Fails to Require Representative Monitoring or Adequate Reporting..........................................................................41

A. Monitoring Is a Centerpiece of the NPDES Permitting Program and Critical to Clean Water Act Compliance.....................................42

B. The Permit Contains Only Woefully Inadequate "Visual" Monitoring Requirements .........................................................44

C. The Permit's Reporting Requirements Are Also Inadequate.......48

III. The Permit Fails to Ensure Compliance with Water Quality Standards...................................................................50

A. The Permit Collects Inadequate Information to Ensure Compliance with Water Quality Standards ....................................................51

B. The Permit Fails to Ensure Compliance with Public Health Water Quality Standards...............................................................53

C. EPA Failed to Explain How the Permit Ensures Compliance with Water Quality Standards ...........................................................56

IV. The Permit Creates a Sweeping Permit Shield and Prevents Enforcement.....................................................................59

CONCLUSION..................................................................................61

# TABLE OF AUTHORITIES

## Cases

*Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*,
765 F.3d 1169 (9th Cir. 2014) ....................................................................25

*Alaska Eskimo Whaling Comm'n v. EPA*, 791 F.3d 1088 (9th Cir. 2015) ................5

*Californians for Alts. to Toxics v. Schneider Dock & Intermodal Facility, Inc.*,
374 F. Supp. 3d 897 (N.D. Cal. 2019) ............................................... 59, 60

*Campbell v. USDA*, 515 F. Supp. 1239 (D.D.C.1981)............................................58

*CBD v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008) ..............................................26, 27

*Ctr. for Biological Diversity v. EPA*, 861 F.3d 174 (D.C. Cir. 2017)........................5

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010)............................12

*Environmental Defense Center v. EPA*, 344 F.3d 832 (9th Cir. 2003)....................35

*EPA v. California ex rel. State Water Res. Control Bd.*,
426 U.S. 200 (1976)...........................................................................23

*Food & Water Watch v. EPA*, 20 F.4th 506 (9th Cir. 2021)......15, 44, 47, 48, 52, 53

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)............................................................................3

*Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004).......................27

*Gill v. DOJ*, 913 F.3d 1179 (9th Cir. 2019) ..........................................................37

*Headwaters, Inc. v. Talent Irrigation Dist.*,
243 F.3d 526 (9th Cir. 2001) ..................................................... 17, 56, 57

*Inland Empire Waterkeeper v. Corona Clay Co.*,
17 F.4th 826 (9th Cir. 2021) .....................................................................60

*League of United Latin Am. Citizens v. Regan*, 996 F.3d 673 (9th Cir. 2021)........54

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ......................................40

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .................... 41, 42, 45

*Motor Vehicle Mfrs. Assn. v. State Farm Mutual Ins. Co. ("State Farm")*,
463 U.S. 29 (1983) ..........................................................................5, 34, 35, 58

*Nat'l Cotton Council of Am. v. EPA*, 553 F.3d 927 (6th Cir. 2009)..................17, 56

*Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893 (9th Cir. 2020) ...........................4, 5

*Native Vill. of Kivalina IRA Council v. EPA*,
687 F.3d 1216 (9th Cir. 2012) ......................................................................... 5

*NRDC v. Cnty. of Los Angeles*, 725 F.3d 1194 (9th Cir. 2013)...................15, 43, 48

*NRDC v. Costle,* 568 F.2d 1369 (D.C. Cir. 1977) ..................................................25

*NRDC v. EPA (In re Pesticide Action Network N. Am.)*,
798 F.3d 809 (9th Cir. 2015).........................................................................54

*NRDC v. EPA*, 279 F.3d 1180 (9th Cir. 2002)........................................................50

*NRDC v. EPA*, 725 F.3d 1194 (9th Cir. 2013)........................................... 15, 34, 43

*NRDC v. EPA*, 808 F.3d 556 (2d Cir. 2015)......................................................13, 50

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin*.,
117 F.3d 1520 (9th. Cir. 1997) ..........................................................................4

*Ohio Valley Environmental Coalition v. Horinko*,
279 F. Supp. 2d 732 (S.D.W. Va. 2003).......................................................35

*Puget Soundkeeper All. v. Port of Tacoma*, 104 F.4th 95 (9th Cir. 2024)...............59

*Puget Soundkeeper Alliance v. Rainier Petroleum Corp*.,
138 F. Supp. 3d 1170 (W.D. Wa. 2015)........................................................ 37

*S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700 (9th Cir. 2007) .......................... 60

*S.F. Baykeeper v. Levin Enters*., 12 F. Supp. 3d 1208 (N.D. Cal. 2013)................. 60

*Sierra Club v. ICG Hazard, LLC*, 2012 U.S. Dist. LEXIS 146140
(E.D. Ky. Sep. 28, 2012) ................................................................... 41

*Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009) .................57

*Washington State Dairy Fed'n v. State*, 18 Wash. App. 2d 259 (2021)..................44

*Waterkeeper All. v. EPA*, 140 F.4th 1193 (9th Cir. 2025)......................................55

*Waterkeeper All., Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005).......................12, 13, 61

**Statutes**

5 U.S.C. § 706(2)(A)........................................................................... 5

7 U.S.C. § 136, *et seq*.......................................................................... 16

16 U.S.C. § 1531(b) ...........................................................................19

16 U.S.C. § 1532(5)(A)......................................................................20

16 U.S.C. § 1536(a)(2)........................................................................ 19

16 U.S.C. § 1536(b)(3)(A) ..................................................................20

33 U.S.C. § 1251(a)(1)........................................................................13

33 U.S.C. § 1251, et seq.........................................................................1

33 U.S.C. § 1311 ..................................................................................13

33 U.S.C. § 1311(a) .............................................................................13

33 U.S.C. § 1311(b)(1)(A) .......... 13

33 U.S.C. § 1311(b)(1)(C) .......... 13, 50

33 U.S.C. § 1311(b)(2)(A) .......... 13

33 U.S.C. § 1313(a)(3) .......... 13

33 U.S.C. § 1313(c)(2)(A) .......... 13, 14, 50, 55

33 U.S.C. § 1313(c)(2)(B) .......... 55

33 U.S.C. § 1314(a) .......... 55

33 U.S.C. § 1314(a)(1) .......... 55

33 U.S.C. § 1317(a)(1) .......... 55

33 U.S.C. § 1318(a) .......... 14, 42, 50, 61

33 U.S.C. § 1318(a)(2)(A)(iii) .......... 15, 42, 45, 46

33 U.S.C. § 1341 .......... 50

33 U.S.C. § 1341(a) .......... 14

33 U.S.C. § 1341(d) .......... 14

33 U.S.C. § 1342 .......... 2, 13

33 U.S.C. § 1342(a)(2) .......... 13, 14, 42, 50, 61

33 U.S.C. § 1362 .......... 13

33 U.S.C. § 1362 (6) .......... 33

33 U.S.C. § 1362 (11) .......... 33

33 U.S.C. § 1365 .......... 59

33 U.S.C. § 1369(b) .....5

33 U.S.C. § 1369(b)(1) .....3

33 U.S.C. § 1369(b)(1)(F) .....2

**Regulations**

40 C.F.R. § 23.2 .....3

40 C.F.R. § 122.22 .....37

40 C.F.R. § 122.28 .....16

40 C.F.R. § 122.28(b)(2) .....25

40 C.F.R. § 122.28(b)(2)(ii) .....16

40 C.F.R. § 122.28(b)(2)(v) .....29, 30, 31, 32, 33, 35

40 C.F.R. § 122.4(d) .....14, 50

40 C.F.R. § 122.41(e) .....43

40 C.F.R. § 122.41(j)(1) .....15, 43, 46

40 C.F.R. § 122.44(d)(1)(vii) .....14

40 C.F.R. § 122.44(i)(1) .....14, 15, 42, 43, 46

40 C.F.R. § 122.44(i)(1)–(2) .....50, 61

40 C.F.R. § 122.44(i)(2) .....15

40 C.F.R. § 122.44(k)(3) .....14

40 C.F.R. § 122.44(k)(4) .....14

40 C.F.R. § 122.48(b) .....15, 43, 45, 47, 52

40 C.F.R. § 124.53(a) .......... 14

40 C.F.R. Part 131 .......... 13

40 C.F.R. § 131.10–11 .......... 14

50 C.F.R. § 402.02 .......... 20

50 C.F.R. § 402.14(a) .......... 20

50 C.F.R. § 402.14(g)(4) .......... 20

50 C.F.R. § 402.14(g)–(h) .......... 20

**Federal Register**

80 Fed. Reg. 36, 986 (June 29, 2015) .......... 55

89 Fed. Reg. 102,134 (Dec. 17, 2024) .......... 3

**Other Authorities**

EPA, NPDES Permit Writers' Manual (Sept. 2010) .......... 52

S. Rep. No. 92-414 (1971) .......... 43, 44

Suryapratap Ray & Sanjana Thanjan Shaju, Bioaccumulation of pesticides in fish resulting toxicities in humans through food chain and forensic aspects, Environ. Anal. Health Toxicol. 38 (2023) .......... 12

## INTRODUCTION

Petitioner Center for Biological Diversity (Center) brings this challenge to the "Pesticide General Permit (PGP) for Discharges from the Application of Pesticides" (the Permit), issued by Respondent U.S. Environmental Protection Agency (EPA) under the Clean Water Act's, 33 U.S.C. § 1251, *et seq*., National Pollutant Discharge Elimination System (NPDES) permitting program. The Permit authorizes the discharge of pesticides with toxic active ingredients directly into, near, and over waterbodies nationwide for activities like weed and algae control, animal pest control, and mosquito control. The Permit covers the discharge of hundreds of thousands, if not millions, of pounds of more than 200 pesticides. The actual scope of these impacts is unknown, though, because EPA has not sought out that data.

Despite well-known, harmful effects of pesticides like chlorpyrifos on people and imperiled species and their habitats, EPA has all but ensured the public and the government are left in the dark about which pesticides are being applied where, and in what amounts. This is primarily because the Permit exempts a stunning 97% of covered entities from the most basic requirement to submit a Notice of Intent (NOI) regarding their discharges. This massive exemption is the central reason why both the National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service (FWS) (together, the Services) determined that the Permit would likely jeopardize the continued existence of 491 threatened and endangered species—

including whooping cranes, gray wolves, and Southern Resident killer whales—within the meaning of the Endangered Species Act (ESA). Such sweeping jeopardy calls are exceedingly rare and should be alarming.

Making matters worse, for the small fraction of permittees required to submit NOIs, EPA collects limited information and only requires permittees to visually monitor their activities if "feasible," a far cry from the Clean Water Act's mandate to include representative monitoring of effluent discharges.

All told, EPA's scheme robs itself and the public of crucial information about toxic pesticides discharged into waters throughout the country, from highly populated areas to federal public lands that millions use and enjoy. This cannot ensure compliance with water quality standards, as mandated by the Clean Water Act, and effectively precludes agency or citizen enforcement of permit violations, undermining the functioning of the NPDES program and the Act as a whole.

This Court should grant the petition for review, hold that EPA has acted arbitrarily, capriciously, and in violation of the Clean Water Act, and remand the Permit to EPA with instructions to re-issue a lawful permit.

## JURISDICTIONAL STATEMENT

This Court has original jurisdiction over this case pursuant to Clean Water Act section 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F) (authorizing review by the Court of Appeals for EPA action in "issuing or denying any permit under [33 U.S.C. § 1342

(NPDES program)]”). Notice of this action was published in the Federal Register. 89 Fed. Reg. 102,134 (Dec. 17, 2024). In accordance with 40 C.F.R. § 23.2 the Permit was considered issued for the purpose of judicial review beginning two weeks after publication in the Federal Register, or on December 31, 2024. *Id*. Petitions for review of NPDES permits must be filed within 120 days of the date of permit issuance. 33 U.S.C. § 1369(b)(1). The Center filed a petition for review of the Permit in this Court on April 29, 2025. Dkt. 1. Thus, the petition is timely. 33 U.S.C. § 1369(b)(1).

Venue is appropriate in the Ninth Circuit if the petitioner “resides” or “transacts business which is directly affected by [the challenged] action” within the Circuit. 33 U.S.C. § 1369(b)(1). The Ninth Circuit is an appropriate venue here because the Center maintains offices within the Circuit and the Permit applies on lands within the Circuit, including Arizona, California, Idaho, Oregon, and Washington.

Article III standing is easily satisfied here. EPA’s legal violation has caused injuries to Petitioner’s members that can be redressed by the Court, and the environmental interests at stake are germane to the Petitioner’s interests. *See Friends of the Earth, Inc. v. Laidlaw Env’t Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). EPA estimates that over 200 different pesticide active ingredients will be discharged to navigable waters under the Permit, 3-ER-680, which covers vast swathes of the

United States. 3-ER-678. EPA acknowledges that many of these active ingredients and their degradates can be highly toxic to "non-target species." *See, e.g.,* 3-ER-700–701 (naled), 3-ER-702–714 (malathion), 3-ER-715–726 (chlorothalanil), 3-ER-727–739 (diazinon). Expert federal wildlife agencies have concluded that the Permit is likely to jeopardize the continued existence of 491 species and adversely modify 206 species' designated or proposed critical habitats. 2-ER-372–386, 2-ER-433, 3-ER-624. Declarations from Center members who work, volunteer, and recreate in areas where the Permit applies illustrate how the Permit directly injures their aesthetic, recreational, scientific, and professional interests in the outdoors, including their interests in federally endangered and threatened species, as well as other wildlife, that are likely jeopardized by the Permit.[1]

Courts have repeatedly found standing for petitioners challenging EPA's failure to comply with the law in approving pesticide uses that harmed members' interests in wildlife and the outdoors. *Nat'l Family Farm Coal. v. EPA*, 966 F.3d

---

[1] *See generally* Declaration of Brett Hartl; Declaration of Ryan Maher; Declaration of Robert Ukeiley; Declaration of Jennifer Sampson White; Declaration of Sean Smith; Declaration of Jonathan Evans. These declarations may be found in Petitioner's Addendum of Standing Declarations. On direct review of an agency action, a petitioner may submit, and this Court may properly consider, declarations establishing the petitioner's standing. *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th. Cir. 1997). Some of the declarations reference NOIs and annual reports using hyperlinks to a public database. Those NOIs and annual reports can also be found at 5-ER-1129–1259.

893, 911–12 (9th Cir. 2020) (standing where member lived in state where pesticide was approved for use and enjoyed viewing harmed species in that state); *Ctr. For Biological Diversity v. EPA*, 861 F.3d 174, 182–85 (D.C. Cir. 2017) (standing to challenge pesticide registration that violated the ESA based on members' interests in viewing animals affected by the pesticide).

## STANDARD OF REVIEW

"Challenges to EPA actions under section 509(b) of the Clean Water Act, 33 U.S.C. § 1369(b), are reviewed under the arbitrary and capricious standard of the Administrative Procedure Act." *Alaska Eskimo Whaling Comm'n v. EPA*, 791 F.3d 1088, 1092 (9th Cir. 2015) Under this standard of review, this Court reviews EPA's action to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *Native Vill. of Kivalina IRA Council v. EPA*, 687 F.3d 1216, 1219 (9th Cir. 2012). To this end, the Court must decide whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Ins. Co. ("State Farm")*, 463 U.S. 29, 43 (1983).

///

///

## ISSUES PRESENTED

1. Whether EPA acted arbitrarily, capriciously, and in violation of the Clean Water Act by exempting nearly all permittees from the NOI requirement and requiring little of those who do submit NOIs.

2. Whether EPA's failure to require representative effluent monitoring and reporting in the Permit violates the Clean Water Act and EPA's regulations.

3. Whether the Permit violates the Clean Water Act and EPA's regulations because it fails to ensure compliance with water quality standards.

4. Whether the Permit violates the Clean Water Act by effectively precluding permit enforcement.

## STATEMENT REGARDING ADDENDUM

Pursuant to Circuit Rule 28-2.7, an addendum at the end of this brief includes the pertinent statutory and regulatory provisions necessary for the Court's determination of the issues presented.

## STATEMENT OF THE CASE

### I. Pesticides Present Significant Dangers to Imperiled Species and People

Pesticides, chemicals designed to kill or ward off pests, are routinely applied to United States ecosystems in enormous quantities. This case focuses on pesticide discharges directly into, near, or over waterbodies. The pesticide uses at issue in this

case fall into four categories: (1) mosquito and other flying insect pest control; (2) weed and algae control; (3) animal pest control; and (4) forest canopy pest control. 2-ER-200–202. The application methods for these uses include broadcast spraying, application by aircraft, from boats, on ground, or "by any means." 2-ER-200–201, 2-ER-231, 2-ER-238, 2-ER-365. The pesticides at issue include herbicides, algaecides, insecticides, fungicides, and rodenticides. 1-ER-112–113. EPA estimates that more than 200 different pesticide active ingredients are used for these four use patterns, including toxic chemical and biological materials that end up in waters of the United States, endangered species' critical habitats, and public recreational lands following application. 3-ER-677, 3-ER-680. While the discharge of these pesticides into waterbodies may be an effective means to eradicate the target pests, they have serious consequences for non-target wildlife and people. 3-ER-523 (lethal, sublethal, and indirect effects expected "to amphibians, birds, bivalves, crustaceans, fish, insects, mammals, plants, reptiles, and snails").

EPA's record shows the considerable quantities of pesticides discharged into waterbodies under the Permit. *See* 3-ER-750–777, 4-ER-779–898 (2017–2019 annual report data); 4-ER-899–1011 (2022 annual report data). From 2017 to 2019, an average of 71,306 briquettes (floating cakes), 71,960 gallons, and 372,973 pounds of product were applied under the Permit each year. 4-ER-893–897. As explained below, however, those numbers paint only a small fraction of the picture because so

few entities covered by the Permit are required to report on the quantities and types of pesticides they discharge into waterbodies.

This is highly problematic because pesticide use kills and impairs wildlife and modifies and destroys their habitat. Adverse effects from pesticides vary, yet the most consistent effect across taxonomic groups is death. Freshwater and anadromous fish species are particularly likely to suffer "unquantifiable negative effects," such as widespread mortality and reduced growth. 3-ER-615, 3-ER-508–509. Some suffer sublethal effects, like humpback and bonytail chubs that have been found with spinal deformities likely related to pesticides. 3-ER-480–483. In bird species, even low levels of exposure to pesticides like diazinon are enough to impair growth or reproduction rates, with higher concentrations causing mortality. 3-ER-505. Herbicides used for weed and algae control are expected to directly kill and reduce growth in exposed plants. 3-ER-512. Many species, like amphibians, insects, and snails, are so sensitive that exposure to pesticides used under the Permit often causes death before any sublethal effects occur. 3-ER-497–501, 3-ER-513–522.

Indirect effects are also pervasive. Many plants, especially endangered species, will suffer when pesticides kill arthropods on whom they rely for pollination and successful reproduction. 3-ER-543–44. Pesticides are directly linked to bee declines, "with the abundance and diversity of wild bee communities negatively correlated with increasingly intensive chemical applications

of pesticides." 3-ER-489. Some birds, like the red knot, piping plover, and western snowy plover "are likely at a higher risk of adverse indirect effects from pesticide impacts to invertebrate prey species as these birds are not able to use other food resources." 3-ER-506. Other species, like the endangered Indiana bat, are also at acute risk of losing important food sources. 2-ER-476–477; *see also* Hartl Decl. ¶¶ 10–12, 17, 21 (food web impacts to aquatic-dependent birds and mammals); Smith Decl. ¶ 6 (food web impacts to orcas).

In addition to the harm of one pesticide application by itself, the *cumulative* impacts of separate treatments can exponentially increase pesticides' harm to wildlife. 5-ER-1089. Additionally, multiple pesticides and their active ingredients can combine to create toxic mixtures resulting in higher levels of toxicity. "Because of the widespread and common occurrence of pesticide mixtures, particularly in streams, the total combined toxicity of pesticides in water . . . may be greater than that of any single pesticide compound that is present." 5-ER-1051 (study found 90% of streams from agricultural, urban, or mixed-use watersheds had 2 or more pesticides or degradates). Many of these pesticides persist in the environment over time, causing chronic exposures. 2-ER-403. Stressors like human population growth and climate change will only exacerbate the negative impacts of pesticides on wildlife. 3-ER-614–619; *see, e.g.,* Hartl Decl. ¶¶ 10, 12 (concurrent impact of drought and pollution on American dippers and river otters in Arizona).

Elements of proposed or designated critical habitat necessary for the survival of endangered and other species are susceptible to adverse effects of pesticides. 3-ER-527–533, 3-ER-553–565. In structuring the Permit, "EPA has failed . . . to minimize adverse effects to designated critical habitats for the vast majority of the proposed covered dischargers." 3-ER-551. For example, the critical habitat of the endangered whooping crane—a large, migratory bird —is at risk because "all pesticides can adversely affect arthropod prey species," large reductions of which "can make critical habitat unsuitable for the species as there may not be sufficient resources to support individuals." 3-ER-536. Whooping cranes are one of North America's rarest birds, with only a few hundred birds in the wild; at one point, only 21 persisted on the planet. 2-ER-465. Their habitat and food sources remain at risk from development, drought and other climate impacts, contaminant exposure, and other human disturbances. 2-ER-465–467, 3-ER-502–507.

///

///

///



Whooping crane photo: Hartl Decl., 8.

Similarly, the Plymouth redbelly turtle "has an extremely limited range and is highly susceptible to changes in its habitat." 3-ER-548. "[A] major threat to the continued existence of this species is the adverse modification of the water quality and levels of the ponds on which it depends," and "[a]ny significant . . . reduction in water quality which would reduce or eliminate vegetation and aquatic prey . . . could adversely modify critical habitat since aquatic vegetation serves as both food and shelter to the turtle." 3-ER-548 (internal quotations omitted). Pesticides that reduce the abundance of plant species in the turtle's critical habitat will inevitably reduce

food and habitat resources. 3-ER-549. Plymouth redbelly turtles live in Massachusetts, where the Permit applies statewide.

Pesticides are also dangerous to people. Multiple pesticide compounds share a "common mechanism of toxicity," and pose unquantified risks. 5-ER-1085. Human exposure to pesticides has been linked to cancer, obesity, endocrine disruption, and other disorders.[2] The risk from consuming fish is exacerbated by some pesticides' tendency to bioaccumulate in fish and other organisms. 4-ER-1067, 2-ER-403–404; Ray, *et al*. at 1–2. "[P]ollutants can biomagnify within an ecosystem, where body burdens disproportionately increase with increasing trophic levels." 2-ER-395 (also discussing study finding pesticides in over 80% of fish samples).

## II. Legal Background and EPA's History of Failure to Properly Regulate Pesticide Discharges Under the Clean Water Act

### A. The Clean Water Act and NPDES Program

The Clean Water Act "is a cornerstone of the federal effort to protect the environment." *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 490 (2d Cir. 2005). Congress passed the Act with the goal of not just reducing, but *eliminating*, all water

---

[2] Suryapratap Ray & Sanjana Thanjan Shajuat 1. *Available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10613562/ (linking to a study collected by the National Library of Medicine). This Court can take judicial notice of documents available on federal agency websites. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

pollution. *Id.* (citing 33 U.S.C. § 1251(a)(1). To achieve this goal, the Clean Water Act prohibits the "discharge of any pollutant" from a "point source"—defined as "any discernible, confined and discrete conveyance"—to navigable waters "except in compliance with law." 33 U.S.C. §§ 1311. The main way to achieve compliance with the Clean Water Act's discharge prohibition is by obtaining an NPDES permit, which controls pollution by establishing effluent limitations that restrict the discharge of pollutants. 33 U.S.C. §§ 1311(a), 1342. All NPDES permits must ensure compliance with both technology-based and, as needed, water-quality based effluent limitations. *Id*. § 1311(b)(1)(A) & (C).

Technology-based limitations operate by identifying specific technologies capable of controlling a pollutant and setting numeric or narrative effluent limitations based on that capacity. In this manner, the Act was designed to ratchet up water quality protections as technology advances, improving water quality over time through more stringent controls. *Id.* § 1311(b)(2)(A); *NRDC v. EPA*, 808 F.3d 556, 563–64 (2d Cir. 2015).

If the technology-based limitations in an NPDES permit are insufficient to meet water quality standards of the states and tribes, permits must additionally contain water quality-based limitations designed to achieve those standards. *See* 33 U.S.C. §§ 1311(b)(1)(C), 1313(a)(3), 1313(c)(2)(A), 1342(a)(2); 40 C.F.R. Part 131. State and tribal water quality standards consist of designated uses for waters, such

as swimmable, fishable, or drinkable, as well as numeric and narrative criteria necessary to protect those uses. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.10–11. Water quality-based limitations in NPDES permits must be "derived from, and compl[y] with all applicable water quality standards." 40 C.F.R. § 122.44(d)(1)(vii).

Further, under Clean Water Act section 401, before EPA issues a permit, the state or tribal land in which the discharge is to occur must certify, or waive its right to certify, that the discharge will comply with its water quality standards; any such state or tribal water-quality based terms must be incorporated into EPA's permit. 33 U.S.C. § 1341(a), (d); 40 C.F.R. § 124.53(a).

Effluent limitations are typically expressed numerically, but when that is "infeasible," permits may instead require "[b]est management practices (BMPs) to control or abate the discharge of pollutants." 40 C.F.R § 122.44(k)(3). BMPs function as a source's primary pollutant control technology and may be required where considered "reasonably necessary to achieve effluent limits and standards." *Id*. § 122.44(k)(4). "No permit may be issued: . . . [w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States." *Id*. § 122.4(d).

NPDES permits must also contain conditions requiring representative effluent monitoring. 33 U.S.C. §§ 1318(a), 1342(a)(2); 40 C.F.R. § 122.44(i)(1). EPA "shall require" permitted sources to "install, use, and maintain such monitoring equipment

or methods" required to "determin[e] whether [they] are in violation" of an applicable effluent limitation or other effluent standard. 33 U.S.C. § 1318(a)(2)(A)(iii). All permits "shall include conditions" requiring representative monitoring "[t]o assure compliance with permit limitations," 40 C.F.R. §§ 122.44(i)(1), 122.41(j)(1), and "shall specify" the "type, intervals, and frequency [of monitoring] sufficient to yield data which are representative of the monitored activity." *Id.* § 122.48(b). Such monitoring conditions are necessary to verify compliance with effluent limitations and to facilitate permit enforcement. *NRDC v. Cnty. of Los Angeles*, 725 F.3d 1194, 1208 (9th Cir. 2013). The Clean Water Act "demands regulation in fact, not only in principle," and representative monitoring enables that mandate. *Food & Water Watch v. EPA*, 20 F.4th 506, 515 (9th Cir. 2021) (vacating EPA's issuance of a general NPDES permit for factory farms in Idaho because the permit lacked representative monitoring) (internal quotations omitted). EPA's regulations also mandate that NPDES permits require reporting of monitoring results, which "shall be established on a case-by-case basis with a frequency dependent on the nature and effect of the discharge, but in no case less than once a year." 40 C.F.R. § 122.44(i)(2).

Thus, to fulfill the Clean Water Act's pollution reduction mandate, the permitting program relies on this multipronged approach: effluent limits, practices

or technologies capable of achieving those limits, and then monitoring and reporting to establish compliance with those limits.

Though most NPDES permits are issued by states (following authorization from EPA)[3] to individual entities, states and EPA can also issue "general" permits to groups of similar dischargers seeking a streamlined permitting process. 40 C.F.R. § 122.28. Rather than requiring permittees to "apply" for coverage, "the permitting authority . . . develops and issues the [general] permit in advance, with dischargers then generally obtaining coverage under the permit through submission of an NOI." 2-ER-192. An NOI notifies the permitting authority of an entity's intent to be covered by the permit and typically contains information about the entity and the planned discharge. *See* 40 C.F.R. § 122.28(b)(2)(ii) (setting forth minimal NOI requirements).

### B. History of Pesticide Regulation and Litigation

For decades, EPA allowed pesticide discharges into or near waters of the United States without requiring NPDES permits. Litigation ensued regarding whether: (1) pesticide discharges involve the addition of a "pollutant" from a "point source"; and (2) the label instructions required by the Federal Insecticide Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq*., are sufficient to protect human

[3] Most states have authorization to implement the federal NPDES program. Those that do not are covered by this Permit. The Permit also applies to federal lands and tribal lands in several states. *See* 1-ER-126–129 (geographic scope of Permit).

health and the environment from the detrimental effects of pesticides in water. *See* 41 ELR 10950 (summarizing history of litigation).

In 2001, following an incident where 92,000 juvenile steelhead were killed by an application of pesticides to water, this Court held that the Clean Water Act requires permits for these discharges and that, at minimum, pesticide residues left after application constitute pollutants and meet the other elements for Clean Water Act coverage. *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532–35 (9th Cir. 2001). The Court also held that compliance with a FIFRA label did not obviate the need for a Clean Water Act permit. *Id.* at 528. However, instead of following this Court's command, EPA capitulated to the pesticide industry's demands and attempted by regulation to exempt from the Clean Water Act discharges directly into waterbodies. In 2009, the Sixth Circuit struck down EPA's rule. *Nat'l Cotton Council of Am. v. EPA*, 553 F.3d 927 (6th Cir. 2009).

Following the Sixth Circuit's decision, EPA issued the first iteration of the Permit in 2011, with subsequent versions issued in 2016 and 2021. 1-ER-177. The Center petitioned for review of the 2021 permit in this Court. 1-ER-185; Ninth Circuit Case No. 21-71306. The challenge resulted in a settlement requiring EPA to request formal ESA consultation with FWS to analyze the effects of the Permit on listed species, among other actions. 4-ER-1012–1026.

EPA and FWS completed their consultation on the proposed Permit, and EPA issued a draft Permit for public comment on November 28, 2023, 1-ER-178, and the final Permit on December 31, 2024, 1-ER-176. According to EPA, "[l]argely, conditions and requirements in the 2026 Permit remain unchanged from the 2011 [Permit], 2016 [Permit], and 2021 [Permit]." 2-ER-185.

The Permit applies to all Operators[4] who discharge biological pesticides or chemical pesticides that leave a residue under the four use patterns listed above. 1-ER-5–6. The Permit's technology-based limitations consist of BMPs (with some variation among use patterns), including Pest Management Measures, which EPA claims will minimize pesticide discharges. 1-ER-19–24, 1-ER-112. The Permit's water quality-based limitations require only that discharges do not result in certain observable changes in the waterbody, such as discoloration or the presence of foam or floating solids, except to the extent those changes would be expected from pesticide application according to the FIFRA label. 1-ER-25. They also include restrictions on discharges to certain impaired and high-quality waterbodies. 1-ER-25. During the application of pesticides, Applicators must visually monitor the area for "adverse incidents," if feasible. 1-ER-26, 1-ER-108–109.

[4] The term "Operator" refers to both pesticide "Applicators" and those who are "Decision-Makers" about pesticide application, as defined in Appendix A. Permit 1-1, A-2, A-3, A-5.

Many of these Permit terms, however, apply only to those permittees required to submit NOIs. *See* 1-ER-7–9. These include Decision-Makers whose central purpose is pest management, who exceed the permit's annual treatment area thresholds, or whose pesticide application may impact NMFS or FWS "Resources of Concern." 1-ER-7–9. Other entities covered by the Permit are not required to submit NOIs or annual reports or comply with certain permit terms. The Permit exempts approximately 97% of permittees from basic requirements, granting them automatic coverage "without the dischargers providing any information on the type, amount, or location of their proposed discharges." 2-ER-401, 3-ER-620.

### C. ESA Consultation and this Permit

In this case, much of the record information about harm to wildlife comes from the opinions of the Services, completed pursuant to the ESA. The purpose of the ESA is to "provide a program for the conservation of . . . endangered species and threatened species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]" 16 U.S.C. § 1531(b). All federal agencies must ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2). "Jeopardy" means "an action . . . reasonably would be expected, directly or

indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. Agencies must also ensure that their actions are not likely to "result in the destruction or adverse modification of [critical] habitat." *Id.*; *see also* 50 C.F.R. § 402.14(g)(4). Critical habitat includes areas that are "essential for the conservation of the species[.]" 16 U.S.C. § 1532(5)(A).

Whenever a federal agency determines that a proposed action may affect listed species, it must consult with the appropriate Service(s), depending on the species present. 50 C.F.R. § 402.14(a). The Services then determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat, set forth in a "biological opinion." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)–(h). If the action is likely to do so, the Services must describe any reasonable and prudent alternative (RPA) to the proposed action that they believe would avoid jeopardy and adverse modification. 16 U.S.C. § 1536(b)(3)(A).

Here, the Services issued damning opinions regarding the effects of pesticide discharges under the Permit, finding likely jeopardy to 491 species. 2-ER-372–386, 2-ER-433, 3-ER-624. FWS found jeopardy for 466 species and adverse modification for every one of those species that had designated or proposed critical habitat (189 species). 2-ER-372–386, 2-ER-433. NMFS found jeopardy to 25 species and adverse modification to designated or proposed critical habitat for 17 species. 3-ER-624.

The Services' jeopardy conclusions were largely based on the lack of information available about most discharges authorized under the Permit. NMFS concluded that "the composition, timing, frequency and location of discharges . . . are unknown for a majority of the discharges to be authorized." 3-ER-609. NMFS additionally noted that EPA is unlikely to know whether permittees comply with the Permit "because most [Permit]-authorized dischargers are automatically covered under the [Permit] and have no reporting requirement." 3-ER-621. FWS agreed, noting that "EPA has failed to structure the [Permit] to minimize adverse effects to species for the vast majority of the proposed covered discharges – specifically, those discharges where Operators [] do not submit an NOI or any other form of notification to EPA and the Service." 3-ER-523. The Services also expressed concern about EPA's lack of enforcement for discharges where an NOI was required but not filed. 3-ER-523, 3-ER-622.

## SUMMARY OF THE ARGUMENT

NPDES permits are the Clean Water Act's primary tool to achieve the goal of eliminating pollution discharges to the nation's waterways. Without an NPDES permit, the discharge of pollutants from a point source is unlawful. It took decades for EPA to succumb to the requirement to regulate pesticide discharges into waters of the United States through the NPDES program. Unfortunately, in this *fourth*

iteration of the Permit, EPA is still failing to meet fundamental Clean Water Act requirements.

*First*, the Permit exempts 97% of permittees from having to file even the most basic information (NOIs) about their intent to discharge. As a result, the Services determined that the Permit would likely jeopardize the continued existence of threatened and endangered species across the country. EPA has not met its burden to justify such a sweeping exemption from the NOI requirement, demonstrate how the Permit addresses the Services concerns, or show with record evidence how the minimal information collected through NOIs meets the Clean Water Act's requirements.

*Second*, the Permit does not require representative monitoring or sufficient reporting of monitoring results. The statute, EPA's regulations, and case law are clear that NPDES permits must not only establish effluent limitations for pollutants of concern but must *also* require permittees to monitor their effluent discharges and report on them to demonstrate compliance. These requirements, which are essential for ensuring that permits are reducing pollution in fact, not only in theory, are absent from the Permit.

*Third*, the Permit fails to meet a bedrock Clean Water Act principle: all NPDES permits must ensure compliance with state or tribal water quality standards. Here, EPA knows little about almost all permittees' discharges, and even those

required to submit lackluster monitoring and reporting forms cannot rise to the agency's duty to ensure compliance with water quality standards designed to protect aquatic life and human health.

*Finally*, EPA has set up a scheme where the public and the agency operate in the dark, with EPA granting Clean Water Act liability coverage to roughly 14,000 permittees to discharge pesticides into waterbodies but securing no effective means to enforce the Permit's terms. Congress intended citizens to fulfill a critical public function by supplementing government enforcement of the Clean Water Act, but the Permit makes that all but impossible. EPA has effectively created a regulatory exemption for pesticide discharges that undermines the Clean Water Act's framework and leaves the Center and its members to suffer the consequences.

## ARGUMENT

### V. The Permit's Nearly Universal NOI Exemption Is Arbitrary, Capricious, and Inconsistent with the Clean Water Act

While general NPDES permits, like this Permit, can streamline permitting processes for categories of similar dischargers, they cannot sacrifice the mandatory elements of the Clean Water Act's permitting program. *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976) ("An NPDES permit serves to transform generally applicable . . . standards . . . into the obligations . . . of the individual discharger."). One way the permitting program seeks to balance these objectives is the NOI requirement. NOIs inform EPA of permittees' intent to

discharge under the general permit. By signing and submitting the NOI, permittees certify that they will meet all eligibility conditions in the general permit and follow its terms and conditions. As such, an NOI functions as the permit's central enrollment process and a mechanism to certify individual permittees' compliance with the permit. Here, approximately 97% of Operators granted coverage under the Permit are not required to file an NOI. 2-ER-401, 3-ER-620. And, for those few Operators who do submit NOIs, EPA demands little in the way of information about pesticide discharges into waters of the United States.

Courts have consistently recognized NOIs not as mere formalities but an essential mechanism supporting lawful general permit coverage. By broadly waiving the NOI requirement for nearly all permittees—seemingly unprecedented in other NPDES permitting contexts—and requiring little of those who do submit NOIs, EPA has unlawfully, arbitrarily, and capriciously robbed itself, federal wildlife agencies, and the public of essential information regarding how pesticides are being applied to the nation's waters under the Permit.

### A. The Permit Unlawfully Exempts Most Pesticide Dischargers from Basic Notice Obligations

As the D.C. Circuit explained, under a general permit, "dischargers may . . . acquire permission to discharge under the Clean Water Act by filing NOIs, which embody each discharger's agreement to abide by the terms of the general permit."

*NRDC v. Costle,* 568 F.2d 1369 (D.C. Cir. 1977); *see also Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014) ("Once a general permit has been issued, an entity seeking coverage generally must submit a 'notice of intent' to discharge pursuant to the permit. [40 C.F.R.] § 122.28(b)(2)."). But these long-held principles regarding the role of NOIs in general permitting are not reflected in this Permit. Instead of requiring all or most dischargers to submit an NOI, the Permit exempts nearly all[5] permittees from NOI submissions, meaning they get automatic coverage without "providing any information on the type, amount, or location of their proposed discharges." 2-ER-401.

One reason the Permit captures only a fraction of the permittees within the NOI submission requirement is its arbitrary "Annual Treatment Area Threshold" definition.[6] The NOI requirement only applies to many permittees if they exceed this threshold. EPA explains that it "developed annual treatment area thresholds that establish NOI requirements for applications to larger areas, which are believed to have the greatest potential for impact to waters of the United States." 2-ER-283.

---

[5] The Permit requires NOIs from agencies "for which pest management for land resource stewardship is an integral part of the organization's operations;" mosquito, other pest, or irrigation and weed control districts; and other entities that exceed annual treatment area thresholds set by EPA. *See* 1-ER-12. Additionally, in theory, regardless of the nature of the entity or the size of the treatment area, Operators must submit an NOI if NMFS or FWS Listed Resources of Concern may be exposed to the discharge.

[6] Another reason is that EPA does not require Applicators who are not Decision-Makers to submit NOIs. 1-ER-13.

EPA's definition and approach are, however, inconsistent and arbitrary in practice. For example, in calculating annual treatment areas for mosquito and forest canopy pest control, permittees are directed to count each pesticide application as a separate area treated. In other words, the treatment areas for these two use patterns are calculated *additively* over the calendar year. 1-ER-109. In contrast, in calculating annual treatment areas for weed and algae control or animal pest control, permittees should "count each treatment area only once, regardless of the number of pesticide application activities performed on that area in a given year." 1-ER-109. Thus, for discharges *directly into waterbodies* for these latter categories, Operators can spray *as many times per year as they want*, while only counting the size of the area treated once. And, within the area treated, Operators can discharge in any location within or on the banks of the waterbody as they see fit but are only required to list this as one treatment area, despite multiple potential locations. 1-ER-109.

EPA provides no rationale or scientific justification for treating various pesticide use patterns differently. EPA instead asks that, because it lacks the relevant data, we just trust its approach. 2-ER-283 (recognizing variation in the availability of data and noting that "EPA [is] relying heavily on its best professional judgment in setting the NOI annual treatment area thresholds for each of the use patterns"). But "[w]ithout some articulated criteria . . . grounded in the record and available scientific evidence," such trust is unfounded. *CBD v. NHTSA*, 538 F.3d 1172, 1224–

25 (9th Cir. 2008) (citation omitted); *see also Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1072 (9th Cir. 2004) (Courts "cannot infer an agency's reasoning;" "[r]ather, 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'") (citation omitted). While EPA is entitled to exercise best professional judgment in permitting decisions, it must still provide a rational explanation for what otherwise appears to be an unscientific and arbitrary approach to setting these thresholds, which are *key* to determining which dischargers must submit NOIs in the first place. It has not done so here.

The consequences of this approach, which all but ensures that the exception swallows the rule, are significant. Take, for example, the expert wildlife agencies' ESA analyses regarding effects on imperiled species due to the NOI requirement's limited reach. First, the agencies identified the information gaps in EPA's NOI approach. NMFS found that, while around 14,000 pesticide applicators nationwide will need coverage under the Permit, only about 350 operators filed an NOI between 2016–2021—approximately three percent. 3-ER-620. Relying on the same facts, FWS found the Permit to have "significant shortcomings," 2-ER-401, that "make[] it impossible for EPA to fully understand the scope and effects of those discharges, or whether these dischargers are complying with the conditions in the [Permit]," 2-ER-415.

Next, the Services looked at the implications of these information gaps to threatened and endangered wildlife, concluding that the Permit is likely to jeopardize hundreds of federally listed species, including birds like the whooping crane, Ridgway's rail, Southwest willow flycatcher, yellow-billed cuckoo, and Gunnison sage-grouse; mammals like grizzly bears, gray wolves, and Southern resident killer whales; fish like numerous species of Pacific Northwest salmon, bull trout, Atlantic salmon, and Atlantic sturgeon; reptiles like the Plymouth redbelly turtle; and hundreds of other ESA-listed species. 2-ER-372–386, 2-ER-433, 3-ER-624; *see also* Hartl Decl. ¶¶ 13–21 (describing concerns related to harm to bird species affected by Permit); Ukeiley Decl. ¶ 20 (same); Smith Decl. ¶¶ 6–13 (describing concerns related to birds, mammals, and fish).

In arriving at its finding of jeopardy, FWS emphasized that the absence of NOI information means there is "no mechanism for EPA to ensure these proposed discharges would not result in short or long-term adverse effects" to listed species. 2-ER-401; *see also* 3-ER-552 ("EPA does not receive any information from dischargers that do not submit NOIs and has no way to conduct oversight of an estimated 97 percent of the discharges covered by the [Permit.]"); 3-ER-620 (NMFS describing "considerable uncertainty" created by the lack of NOIs). Sweeping jeopardy conclusions from both Services like this are exceedingly rare, and it is hard to imagine the expert agencies being any clearer in their conclusions.

Finally, beyond the arbitrary line drawing for treatment areas and the significant problems identified by the Services, EPA also fails to acknowledge that exempting most Operators from the NOI requirement has more than just informational consequences. Operators who are not required to submit NOIs are also not required to comply with many of the Permit's *substantive limitations*, most notably the Permit's technology-based limitations, which establish BMPs and other pollution reduction requirements. 1-ER-19–24. They are also exempt from having to prepare, submit, or follow a Pesticide Discharge Management Plan (PDMP), which is only required for "large entities." 1-ER-27; *see also* 1-ER-111, 1-ER-114 (defining "large entity" and "small entity").[7] Whatever teeth the Permit could be said to have, EPA has exempted nearly all permittees from meeting those requirements.

### B. EPA Has Not Met its Burden to Establish the NOI Exemption Under § 122.28(b)(2)(v)

EPA's regulations, 40 C.F.R. § 122.28(b)(2)(v), allow waiver of the NOI requirement if EPA determines that it would be "inappropriate." EPA's record,

---

[7] EPA does not require the handful of "small" entities submitting NOIs to prepare a PDMP. Rather, such entities are only required to prepare—but not even submit—a Pesticide Discharge Evaluation Worksheet, which EPA deems to be less of a burden. *See* 1-ER-143–146, RTC, 27. Entities required to submit an NOI solely because the discharge may expose NMFS or FWS Listed Resources of Concern are also exempt from the PDMP requirement. 1-ER-27. Thus, EPA purports to be addressing the Services' concerns about listed species by requiring NOIs where Resources of Concern are identified, but then simultaneously exempts those entities from important PDMP obligations. *See also infra* section C.

however, contains little support for EPA's decision that NOI requirements would be "inappropriate" for the vast majority of Operators here. And, indeed, the Center is unaware of any other NPDES general permit EPA has issued to date that uses this exemption in such a broad manner.

To meet the regulation's high burden, EPA "shall" analyze six factors to justify its use of the exemption: (1) "the type of discharge;" (2) "the expected nature of the discharge;" (3) "the potential for toxic and conventional pollutants in the discharges;" (4) "the expected volume of the discharges;" (5) "other means of identifying discharges covered by the permit;" and (6) "the estimated number of discharges to be covered by the permit." 40 C.F.R. §122.28(b)(2)(v). EPA must also "provide in the public notice of the general permit the reasons for not requiring a notice of intent." *Id.* The only expressed rationale for EPA's decision to drastically limit the universe of Operators required to submit NOIs is contained in an appendix to the Permit Fact Sheet. 2-ER-281–283. The nature of discharges allowed under the Permit (i.e., directly to waterways); the toxicity of most, if not all, of the pesticides discharged through it; the limited information available to identify the type, volume, and number of these discharges; and EPA's failure to provide a reasoned explanation for its reliance on this exemption, show that EPA has not met its burden to establish that a regulatory break is justified here.

*First*, EPA unreasonably discounted the toxicity of permitted discharges. The analysis of this factor consists of two sentences merely stating EPA's expectations that toxicity would not "vary among use patterns," and that "the potential for impacts from high concentrations of toxic or conventional pollutants in the discharge would be smaller when fewer acres or linear feet are treated." 2-ER-282. Rather than addressing pesticides' renowned high potential for toxicity, EPA "gave particular weight to the expected volume . . . and the estimated number of discharges" to be covered by the Permit, despite not knowing—or even estimating—either. 2-ER-282. It nonetheless speculated, without record support, that "a large majority [of permitted entities] represent dischargers performing small pesticide applications that EPA considers to have very low potential for impact." 2-ER-282. On this basis, EPA decided the administrative burden of requiring NOIs from all dischargers outweighed the value of the information it would receive. 2-ER-282.

This conclusion is unsupported by any record evidence and fails to consider the toxicity of the chemicals at issue as required by 40 C.F.R. §122.28(b)(2)(v). Representative chemicals used under the Permit cause a range of direct and indirect toxic impacts to all manner of species, commonly causing death. *See, e.g.,* 3-ER-497–524. These include cumulative impacts to species from exposure to multiple "small" applications of these toxic pesticides. *See, e.g.*, 4-ER-1051 ("Because of the widespread and common occurrence of pesticide mixtures, particularly in streams,

the total combined toxicity of pesticides in water or other media often may be greater than that of any single pesticide compound that is present.”). As the Fact Sheet provides, referencing a 10-year study by the U.S. Geological Survey, “the most common form of pesticide exposure for aquatic organisms is simultaneous exposure to multiple pesticides,” and “[m]ore than 50 percent of all stream samples contained five or more pesticides.” 2-ER-291. To that point, EPA acknowledges that Permit discharges may well “co-occur with other manmade contaminants and/or other pesticides from other uses.” 2-ER-291. Yet, in its analysis of the 40 C.F.R. § 122.28(b)(2)(v) exemption, EPA is silent on this risk of cumulative impacts, let alone any of the toxicity risks that individual pesticide discharges pose. 2-ER-282.

*Second*, EPA justifies this exemption by arbitrarily assuming that the toxicity and volume of discharges will track consistently with the size of the area treated. 2-ER-282. (“EPA would expect . . . that the potential for impacts from high concentrations of toxic or conventional pollutants in the discharge would be smaller when fewer acres or linear feet are treated.”); 2-ER-282 (“EPA expects that, in general, the volume of the discharge will vary proportionally with the number of acres and linear miles treated.”). No rationale or record evidence is provided for these conclusory assumptions, which fail to consider that real-world pesticide uses and treatment approaches span a wide variety of toxicities, patterns, concentrations, and mixes. Because the effluent limitations that EPA must set and enforce under this

Permit are based on restrictions to "quantities, rates, *and concentrations*" of discharged chemical pollutants under the under the Clean Water Act, and chemical pollutants have inconsistent concentrations, it is unreasonable to ignore that inconsistency through this exemption. 33 U.S.C. § 1362 (6), (11). Indeed, it is easy to imagine how discharges of a low-toxicity product spread over a wide area could be less harmful than a highly toxic product concentrated in one locality. *See* 5-ER-1106 (commenters critiquing EPA's sized-based rationale, noting that pesticide applications to small ponds could be of greater concern "precisely because their diminutive size allows for less assimilative capacity, or because local residents feel a greater personal attachment to them"). Instead of considering this variation in permitted discharges using the regulatory factors of toxicity and volume, 40 C.F.R. § 122.28(b)(2)(v), EPA arbitrarily and unlawfully collapsed those factors into one crude and unsupported, size-based analysis.

The record is replete with examples where change in area does not explain change in toxicity or volume. For instance, both Sure-Cran Services and Decas Cranberry Co. reported using similar chemicals for weed, algae, and animal pest control in cranberry bogs in a similar geographic area in 2022, but Sur-Cran reported using 2,390 pounds of pesticides on 537 acres, 5-ER-1245–1250, while Decas reported using 5,148 pounds on 371 acres, 5-ER-1241–1244; more than twice the amount for an area less than 70 percent of the size. While just one example, this

nonetheless illustrates the arbitrary nature of EPA's sweeping size-based NOI exemption.

Rather than addressing the inherent complexity of a permit covering more than 200 active ingredients with varying uses and toxicities, EPA developed its coarse area thresholds based on an undefined "logical break" it selected between different treatment area sizes. 2-ER-282. EPA identifies no facts upon which it based that decision. While the Court's review of EPA's action is "narrow," the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotations omitted). It has not met that obligation here.

*Third*, EPA attempts to wave these issues away by vaguely stating it "may be able to identify pollutant discharges from Operator-submitted data, ambient water sampling data, and other information submitted by pollutant dischargers pursuant to federal or state law." 2-ER-282. But the Clean Water Act is not designed as a needle-in-a-haystack law. *See NRDC v. EPA*, 725 F.3d 1194, 1208 (9th Cir. 2013) (noting that Congress intended "to promote straightforward enforcement of the Act . . . to avoid the necessity of lengthy fact finding [or] investigations" and that the Clean Water Act is "viewed by many as the easiest of the federal environmental statutes to enforce."). And EPA provides no details regarding what other Operator-submitted

pollution data, ambient water quality sampling data (as *no sampling whatsoever* is required under the Permit, *see infra* at II.B., or specific state- or federal data could fill the significant informational gaps left by EPA's broad NOI exemption. 2-ER-282. That this is the *fourth* iteration of the Permit and that EPA has yet to gather such information over more than 14 years shows just how "implausible" EPA's rationale is. *State Farm*, 463 U.S. at 43.

In sum, EPA's interpretation of 40 C.F.R. § 122.28(b)(2)(v) turns the regulation on its head, transforming NOIs from the default mechanism for coverage into a rare exception. Courts have consistently held that procedural shortcuts like this violate the Clean Water Act's permitting program. *See, e.g.*, *Environmental Defense Center v. EPA*, 344 F.3d 832, 855–858 (9th Cir. 2003); *Ohio Valley Environmental Coalition v. Horinko*, 279 F. Supp. 2d 732, 758 (S.D.W. Va. 2003). By exempting the vast majority of permittees from the NOI requirement, EPA has done just that.

### C. The Permit Fails to Rationally Address the Services' Serious Concerns

NMFS and FWS both determined that the Permit would jeopardize ESA-listed species, based largely on the lack of information collected by EPA. To address those serious concerns, the Services developed RPAs in their biological opinions to prevent jeopardy. FWS's RPA explains, "the proposed [Permit] structure, *which allows the vast majority of permitted discharges to proceed without notification to*

*EPA or the Service,* must be addressed to ensure against the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 2-ER-433. (emphasis added). Similarly, NMFS's 2021 biological opinion, which it built upon in reviewing the 2026 Permit, directed that "EPA must correct the NOI consistency review process." 3-ER-626. In its biological opinion "amendment" for the 2026 Permit, NMFS expressed an expectation of improvement but noted it does "not yet have enough information to evaluate" the effect, concluding that changes between the 2021 and 2026 Permits did not solve serious species and habitat risks: "Therefore, our jeopardy and adverse modification determinations still stand[.]"). 3-ER-643–644.

Both Services' RPAs advised EPA to require all Operators to submit an NOI if they determine that proposed activities overlap with ESA-list species or designated critical habitat. *See* 2-ER-433–434, 3-ER-626–628. To facilitate this determination, EPA and the Services are relying on EPA's development of a new geospatial mapping tool, which EPA expects all potential permittees to use. 2-ER-207, 2-ER-433–434, 3-ER-630–631.

There are two problems with this approach. *First*, the geospatial mapping tool does not yet exist. EPA states that it expects it to be ready by the time the 2026 permit takes effect, but whether it will be able to achieve that goal remains unclear. 2-ER-207, n.3, 2-ER-315. EPA's decision must be judged based on the record before

the agency at the time it rendered its decision, not based on future promises. *Gill v. DOJ*, 913 F.3d 1179, 1187 (9th Cir. 2019) (The basis for the agency's decision must come from the record). Right now, there is no way for the Court to assess the effectiveness or utility of this yet-to-be-seen tool EPA expects thousands of potential permittees to utilize—a problem amplified by practical concerns expressed by governmental commenters. *See, e.g.,*3-ER-748–749 (Comments from Massachusetts Department of Environmental Protection that existing approaches "make it difficult to determine affected waters").

*Second*, the Permit does not require all permittees seeking coverage to *certify* that they used the tool and *verify* that no NMFS or FWS Resources of Concern may be impacted. EPA is taking it on faith that all potential permittees will use the tool before pesticide application, and EPA is willing to provide permit coverage without even a simple certification that the process was completed. This is not how the NPDES program works. *See, e.g.,* 40 C.F.R.§ 122.22 (NPDES permit applications and reports must be signed and certified under the penalty of perjury); *Puget Soundkeeper Alliance v. Rainier Petroleum Corp*., 138 F. Supp. 3d 1170, 1178 (W.D. Wa. 2015) (noting that "failure to certify each and every monthly report would constitute a violation of the General Permits" at issue in the case). Without requiring any certification, it is impossible to see how the Permit addresses the Services' concerns. 2-ER-427. ("Those Operators that do not review

whether their discharges are eligible for automatic coverage without an NOI, and those that make incorrect determinations about whether they need to submit an NOI, would not provide notification to EPA," making it "impossible" to confirm compliance.); *see also* 3-ER-577.

Moreover, while EPA relies on the forthcoming geospatial mapping tool to address the Services' concerns, it simultaneously states that it does not expect a meaningful increase in the number of NOIs submitted based on these additional species-related requirements. *See, e.g.,* 2-ER-279 (EPA estimates that approximately 14,000 Operators will obtain coverage under the 2026 Permit, the same as under the 2021 Permit, and "continues to estimate that less than 2 percent of the total number of Operators would need to meet additional permit requirements in the [Permit's] ESA related provisions."). It is difficult to see how these findings can coexist unless nothing will practically change under the new Permit. The Services' jeopardy calls will likely remain because almost all Operators will continue to be exempted from the NOI requirement and the massive information gaps about pesticide discharges into waters of the United States will continue unabated.

### D. EPA's Lack of NOI Submissions Is Compounded by the Minimal Requirements for those who Do Submit NOIs

Beyond the fact that so few entities are required to submit NOIs, what *is* submitted is woefully inadequate, which is arbitrary, capricious, and inconsistent with the Clean Water Act.

A quick look at NOIs submitted under the 2021 Permit is telling. In 2022, the U.S. Forest Service submitted an NOI for noxious weed control on the San Juan National Forest in Colorado. 5-ER-1129–1138. The NOI provided almost no information. When asked to list the receiving waters where spraying will occur, it simply stated that "[c]overage [is] requested for all waters of the United States within the Pest Management Area identified above," which is the entirety of the National Forest. *Id*. The NOI included a map circling 2.45 million acres, with no further information on where or when spraying would occur or what pesticides and quantities would be used. 5-ER-1137–1138; s*ee also* 5-ER-1199–1202. (NOI for weed and algae control in Olympic National Forest seeking coverage for spraying in "all waters of the United States" within "[a]ll National Forest System lands within the boundaries of the Olympic National Forest," which is 633,000 acres,[8] and attaching a map with large swaths of land circled but no details on affected waterbodies).

On the other side of the country, in Massachusetts, cranberry bogs covered by the Permit discharge extraordinary amounts of pesticides into waterways, with just as little information provided in most NOIs. For example, the Decas Cranberry Managed Bogs' NOI only identified the pest management area using a general map and a request for coverage over "all waters of the United States within the Pest

[8] https://www.fs.usda.gov/r06/olympic/maps-guides

Management Area." 5-ER-1235–1240. No specific waterbodies were identified. The annual report submitted for the same year indicated that the treatment area totaled 371 acres (which does not match the total numbers of acres even remotely calculable from the NOI map) across three Plymouth County towns but provided no map of the areas treated or waterbodies affected. 5-ER-1241–1244; *see also* 3-ER-748–749 (Massachusetts Department of Environmental Protection comments raising similar concerns and noting that NOI information "is not adequate to determine affected waterbodies and towns").

These are but a few examples of how little information permittees provide to EPA or the public in their NOIs. In contrast, many other general permits require NOIs to contain more information than the Permit, with California's general permits for pesticide discharges being particularly instructive. California's NOI form requires the permittee to specify the target organisms for treatment; list the name, active ingredients and, if known, degradation by-products of all pesticides intended to be used; provide the anticipated start and end date of pesticide use; and list the types of adjuvants added by the discharger.[9]

---

[9] *Available at*: https://www.waterboards.ca.gov/water_issues/programs/npdes/pesticides/ This Court may take judicial notice of the California permits. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) ("[D]ocuments on file with administrative agencies — such as the State Water Resources Control Board — are judicially noticeable.").

By requiring so little from entities that submit NOIs, EPA cannot get a valid picture of the nature and extent of the pesticide discharges it is permitting. While general permits differ from individual permits, the Clean Water Act still demands basic information, and in the general permitting context, soliciting that information is EPA's burden. *See, e.g.*, *Sierra Club v. ICG Hazard, LLC*, 2012 U.S. Dist. LEXIS 146140, *27 (E.D. Ky. Sep. 28, 2012) ("[T]he permitting agency bears the burden for understanding the pollutants that might be discharged and writing the [general] permit with appropriate limitations. [T]hrough the [NOI] process, the permitting agency can ask dischargers for specific information, and to obtain coverage under the general permit, that information must be disclosed."). Here, EPA fails to carry its burden of requesting pertinent information.

## VI. The Permit Violates the Clean Water Act and EPA's Regulations Because it Fails to Require Representative Monitoring or Adequate Reporting

The Permit's minimal "visual" monitoring and reporting requirements violate the Clean Water Act because they fail to accurately inform EPA, the permittee, or anyone else about compliance with terms of the permit or of unlawful pesticide discharges entering the waters of the United States. EPA's rationale for requiring so little of permittees is unsupported by the record and is based on impracticality concerns, which are outside the confines of the Act. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 373 (2024) (Courts must "use every tool at their disposal to determine the best reading of the statute."). Federal agencies are not empowered

to administratively effect changes to the law to suit their policy preferences, as EPA is attempting to do through this Permit. *Id.* The Permit's monitoring and reporting provisions are thus unlawful, arbitrary, and capricious.

### A. Monitoring Is a Centerpiece of the NPDES Permitting Program and Critical to Clean Water Act Compliance

NPDES permits must require representative effluent monitoring. 33 U.S.C. §§ 1318(a), 1342(a)(2); 40 C.F.R. § 122.44(i)(1). Courts have rejected EPA permits that fail to do so, as this Court should here.

*First*, the statute and regulations unambiguously require all NPDES permits to include representative monitoring sufficient to ensure compliance with a permit's effluent limitations. EPA "*shall require*" permitted sources to "install, use, and maintain such monitoring equipment or methods" required to "determin[e] whether [they] are in violation" of any applicable effluent limitation or other effluent standard. 33 U.S.C. § 1318(a)(2)(A)(iii). Section 402 of the Act further establishes that permits must contain conditions "to assure compliance" with effluent limitations and water quality standards, "including conditions on data and information collection, reporting, and such other requirements." 33 U.S.C. § 1342(a)(2).

EPA's regulations, in turn, require that all permits "shall include conditions" requiring representative monitoring "[t]o assure compliance with permit

limitations," 40 C.F.R. § 122.44(i)(1), and "shall specify" the "type, intervals, and frequency [of monitoring] sufficient to yield data which are representative of the monitored activity." *Id.* § 122.48(b); *see also id*. § 122.41(j)(1) (Monitoring "shall be incorporated" into "all NPDES permits."). These obligatory monitoring requirements complement, but are separate from, permit conditions establishing the operational systems and controls used to achieve compliance with permit limits. *See* 40 C.F.R. § 122.41(e). The purpose of monitoring is, accordingly, to measure effluent and its constituent pollutants to document whether a discharger is meeting its permitted limits.

*Second*, federal courts have recognized that monitoring conditions are necessary to verify compliance with effluent limitations and enforce permits. *NRDC v. Cnty. of Los Angeles*, 725 F.3d 1194, 1207–08 (9th Cir. 2013) ("[A]n NPDES permit is unlawful if a permittee is not required to effectively monitor its permit compliance"). In *County of Los Angeles*, this Court explained that the "[t]he NPDES program fundamentally relies on self-monitoring" and that "Congress' purpose in adopting this self-monitoring mechanism was to promote straightforward enforcement of the Act." *Id*. at 1208 (quotations and citations omitted). Indeed, as the legislative history underscores, this is "to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement." S. Rep. No. 92-414 (1971), 92nd Cong., 1st Sess. 64, *reprinted in* 1972 U.S.C.C.A.N. 3668,

3730. And the reason here is simple: EPA does not independently know whether a pesticide discharger has complied with the Permit's effluent limitations or whether the BMPs are achieving their intended outcome (let alone being properly implemented). Monitoring provides that necessary check at the permittee level to ensure compliance with this legally binding permit.

This Court recently reaffirmed the critical importance of representative monitoring in a similar circumstance, finding that the Clean Water Act "demands regulation in fact, not only in principle," and that representative monitoring enables that mandate. *Food & Water Watch*, 20 F.4th at 515 (9th Cir. 2021) (internal quotations omitted). In *Food & Water Watch*, the Court remanded a Clean Water Act general permit after deciding that the permit's reliance on visual inspection did not constitute representative monitoring. *Id*. at 517; *see also Washington State Dairy Fed'n v. State*, 18 Wash. App. 2d 259, 265, 300-301 (2021) (general permit did not comply with the Clean Water Act because "there was no water quality monitoring required beyond 'visual inspections to make sure the field edge practices are working.'").

### B. The Permit Contains Only Woefully Inadequate "Visual" Monitoring Requirements

The Permit authorizes dangerous pesticide activities, including the application of highly toxic chemicals directly into, on the banks of, or above waters of the United States. These waters are sometimes located in highly populated areas (e.g.,

Massachusetts) and other times in more remote areas that represent some of our nation's most treasured national parks and forests and that support and provide habitat for hundreds of imperiled species (e.g., federal lands in Washington and Colorado). Yet, despite the risks this activity presents and the Clean Water Act's clear legal obligations for representative monitoring, the Permit imposes only the following vague "visual monitoring" requirements for Operators: (1) for Applicators to "visually assess the area to and around where pesticides are applied" when "feasibility allow[s]," and (2) for Operators to "visually assess the area to and around where pesticides are applied" during "any Operator post-application surveillance." 1-ER-26. These requirements are not remotely tied to the statutory definition of monitoring, which requires them to "install, use, and maintain . . . monitoring equipment or methods." *See* 33 U.S.C. § 1318(a)(2)(A)(iii); *Loper Bright*, 603 U.S. at 373. Nor has EPA met its own regulation's requirement that it "shall specify" the "type, intervals, and frequency [of monitoring] sufficient to yield data which are representative of the monitored activity." 40 C.F.R. § 122.48(b). These mere suggestions of observation are a far cry from what the Clean Water Act demands and fail to prevent and remedy unlawful pollution.

The Permit purportedly requires documentation of the findings of visual monitoring but goes on to establish that Operators may simply provide "the reason why no visual monitoring was conducted," effectively rendering any whisper of a

monitoring requirement in the Permit optional. 1-ER-26, 1-ER-36–38. The Permit's "take a look around if it's feasible and if you want to" approach does not satisfy the statute and regulations' demand for monitoring to "determin[e] whether [permittees] are in violation" of applicable effluent limitations or other standards, 33 U.S.C. § 1318(a)(2)(A)(iii), and to "assure compliance with permit limitations," 40 C.F.R. §§ 122.44(i)(1), 122.41(j)(1).

Notwithstanding inherent weaknesses in the Permit's BMPs, EPA must still include monitoring provisions to ensure that the permittee, EPA, and the public can determine whether those BMPs are being met. Simply visually assessing the area around where the pesticides are applied cannot ensure, for example, compliance with the provisions requiring that Operators "use only the amount of pesticide and frequency of pesticide application necessary to control the target pest." 1-ER-19; *see also* 1-ER-20–24 (setting forth the BMPs required for each pesticide use pattern). Visual monitoring is entirely untethered to the statutory and regulatory requirements designed to ensure compliance with permit limitations.

Further, it belies factual reality that contemporaneous visual monitoring (when feasible) would allow a permittee to know whether there had been an "adverse incident," which is the central component of the Permit's monitoring provision. *See* 1-ER-26. The Permit defines adverse incident to include a "toxic or adverse effect," such as washed up or floating fish and effects to people such as skin

rashes, vomiting or lethargy. 1-ER-108–109. Nothing in the record shows that the impacts of these pesticides will instantaneously be observable, especially regarding harms to people from recreation in waterways following an application. *See, e.g.*, 3-ER-622 ("Dischargers will not always be able to observe adverse responses resulting from their pesticide applications."); 5-ER-1115 ("Many (if not most) [adverse incidents] will *never* be observable to the naked eye – certainly not on basis of a single observation."). The Permit references post-application monitoring but does not *require* it unless an Operator happens to already "perform[] post application surveillance in the ordinary course of business." 2-ER-257; *see also* 5-ER-1090–1091 (commenters critiquing the Permit's visual monitoring provisions and lack of required post-application surveillance); 5-ER-1115–1116 (same).

In *Food & Water Watch*, the Court noted that EPA's discretion in crafting monitoring requirements is limited because "40 C.F.R. § 122.48(b) specifies that a permit must contain monitoring provisions sufficient to yield representative data." *Id*. at 515 (cleaned up). At issue in *Food & Water Watch* was a "zero-discharge" permit limitation. While the Permit's effluent limitations are far less stringent, the case applies with equal force because this Court's holding requires more than visual inspection for monitoring. "Without a requirement to monitor runoff from irrigated CAFO fields, there is no way to ensure that a CAFO is complying with the Permit's dry weather no-discharge requirement for land-application areas" *Id*. at 517 (citing

*Cnty. of L.A.*, 725 F.3d at 1207). Indeed, even the aspect of the Idaho permit the Court upheld requires far more than the Permit here. This Court found:

> CAFOs are required to perform daily inspections of water lines, and weekly inspections of storm water diversion devices, runoff diversion structures, devices channeling contaminated storm water, and waste storage containers. These mandated inspections are, in effect, monitoring requirements.

*Id.* at 516–517. The Permit's visual monitoring requirements do not even come close to the only requirements that passed muster under this Court's ruling in *Food & Water Watch*. The Permit's monitoring provisions cannot ensure compliance with its terms and make no practical sense.

### C. The Permit's Reporting Requirements Are Also Inadequate

Given the absence of legally-required monitoring provisions, unsurprisingly, the Permit requires no meaningful reporting of monitoring results. Annual reports are the only place the public, and presumably the agency itself, receives information on the types and quantities of pesticides that were *actually applied in a given year*. For starters, of course, the annual reporting requirements only apply to certain Operators, none of which includes the 97% of permittees that do not submit an NOI. 1-ER-38–40, 2-ER-270. Because of the narrow subset of Operators required to submit annual reports, very few annual reports are made publicly available. For the reporting years 2022–2024, only 272 annual reports submitted by 101 Operators can

be found in EPA's online NPDES permit database.[10] Given the estimate of more than 14,000 pesticide Operators covered by the Permit, this reflects reporting by a minute fraction of permitted dischargers.

EPA claims that annual reports contain "specific information concerning the scope and nature of discharges of pollutants permitted under the [Permit]" that will be used "to assess permit compliance and to determine whether additional controls on pollutant discharges are necessary to protect water quality." 2-ER-270–271. The annual reports submitted under the 2021 Permit, however, can hardly be said to reflect EPA's intent, in many cases providing nothing more than sweeping generalities—largely because EPA does not require representative monitoring data in the first place.

For example, the 2022 annual report for mosquito and weed control in northeast Massachusetts does not list a single waterbody where pesticides were discharged. Instead, it provides only a narrative description of the towns in which spraying occurred. The report states that the areas treated totaled 547,174 acres with no further specifics and no map provided. 5-ER-1229–1234. *See also, e.g.*, 5-ER-1241–1244 (cranberry bog annual report containing no map or description of waterbodies); 5-ER-1251–1254 (same).

---

[10] https://permitsearch.epa.gov/epermit-search/ui/search

Further, Operators are not required to report the severity of the problem they were aiming to address through the pesticide application, making it nearly impossible to assess whether Operators are, in fact, using the minimum amount of pesticides necessary, as the Permit requires. 1-ER-19–24.

The Permit's lack of representative monitoring is unlawful and ensures that permittees' annual reporting provides little information. The Clean Water Act and EPA's regulations require more. 33 U.S.C. §§ 1318(a), 1342(a)(2); 40 C.F.R. § 122.44(i)(1)–(2).

## III. The Permit Fails to Ensure Compliance with Water Quality Standards

NPDES permits must contain limits to ensure compliance with water quality standards. *See* 33 U.S.C. §§ 1311(b)(1)(C), 1342(a)(2); 40 C.F.R. § 122.4(d). These standards protect public health and enhance the nation's waters for the "propagation of fish and wildlife, recreational purposes," and other uses. 33 U.S.C. § 1313(c)(2)(A); *see, e.g.,* Hartl Decl. ¶¶ 10–12 (recreational interests in fish and wildlife threatened by impacts from Permit pesticides). EPA confers with states under Clean Water Act section 401, 33 U.S.C. § 1341, about state water quality standards but "has an independent duty under the [Clean Water Act] to ensure compliance with state and federal water quality standards" and impose "additional permit conditions necessary to meet that end." *NRDC*, 808 F.3d at 580 (cleaned up); *NRDC v. EPA*, 279 F.3d 1180, 1188 (9th Cir. 2002). Due to the inadequacy of the

information gathered under the Permit's NOI, monitoring, and reporting provisions and its failure to consider public health impacts, the Permit does not ensure compliance with water quality standards. Its issuance is thus unlawful, arbitrary, and capricious.

### A. The Permit Collects Inadequate Information to Ensure Compliance with Water Quality Standards

As EPA itself identifies, NOIs are key sources of information to determine whether additional water quality-based effluent limitations are "necessary to meet applicable water quality standards." 2-ER-197. But EPA has designed a Permit that generates no information on which to base that determination for nearly all covered activities. This failure is the reason three tribes gave for refusing to certify that the Permit will comply with their water quality standards. *See* 5-ER-1124–1128 (Morongo Band of Mission Indians); 5-ER-1122–1123. (Lac du Flambeau Band of Lake Superior Chippewa Indians); 5-ER-1119–1121 (Leech Lake Band of Ojibwe). And rightly so.

The Permit further lacks adequate monitoring provisions to confirm that covered Operators are following the Permit's terms. Specifically, its monitoring requirements cannot ensure compliance with all state-specific conditions. The Permit's conditions for Washington, added through the 401 certification process, serve as a good example. For specific use patterns, Washington has included the following requirement: "Wherever treated water from a pesticide application

eventually flows to a point of compliance, the Project proponent must ensure that the pesticide concentrations do not exceed the following limits at the point of compliance." 1-ER-95. This condition then lists specific instantaneous concentrations of certain chemicals (e.g., Acrolein 21 μg/l, Xylene 5.1 mg/l). 1-ER-95. For Operators to know whether they are meeting these concentration-based criteria, they would need to understand the characteristics of their effluent and of the receiving water. *See* EPA NPDES Permit Writers' Manual at 8.1.1 (The purpose of monitoring is to, *inter alia*, "characterize effluents and characterize receiving water.").[11] The Permit contains no monitoring requirements aimed at collecting this data.[12]

Simply observing for adverse incidents (1-ER-26) cannot possibly allow a permittee to understand whether its discharges meet the precise conditions included through the 401 certification process. As this Court has emphasized, EPA's "discretion to decide which monitoring requirements to include in an NPDES permit" is cabined by 40 C.F.R. § 122.48(b), which "specifies that a permit must contain monitoring provisions 'sufficient to yield [representative] data.'" *Food &*

---

[11] *Available at*: https://www.epa.gov/npdes/npdes-permit-writers-manual

[12] This is just one clear example, but similar examples are apparent across other states and tribes. *See, e.g.,* 1-ER-45–47 (requiring Operators to control discharges to meet specific Massachusetts water quality standards).

*Water Watch*, 20 F.4th at 515. What EPA has required here is a far cry from that obligation.

### B. The Permit Fails to Ensure Compliance with Public Health Water Quality Standards

The Permit's failings are particularly glaring when it comes to ensuring compliance with water quality standards designed to protect people. Despite well-known harms from exposure to pesticides, EPA did not analyze or address public health concerns in finalizing the 2026 Permit. The only real discussion in the Fact Sheet, which reflects the agency's justification for this Permit, is in Appendix I, where EPA merely relies on FIFRA to protect human health. 2-ER-287. But, as noted above, FIFRA and the Clean Water Act are not interchangeable in this context because FIFRA relies on a cost-benefit balance, whereas the Clean Water Act does not.

In the Fact Sheet's environmental justice section, EPA pays lip service to human health concerns but admits how little information it has: "[T]he quantity of NOIs and the information submitted as part of the current NOIs present a challenge in the limited amount of and format of information EPA currently has available to perform a geographic specific analysis related to communities with environmental justice concerns." 2-ER-280. But EPA simply kicks the can down the road once again by saying that this new Permit will help in future environmental justice analyses. 2-ER-281.

The sparse information in the record, however, makes clear that EPA should have considered these risks. *See, e.g.*, 4-ER-1067 (noting that humans can be exposed to pesticides through drinking water and consumption of contaminated fish); *see generally supra* at 12. Indeed, the analytical importance of pesticides and human health harms is reflected in numerous court decisions. This Court has repeatedly addressed EPA's failings with respect to the use of the pesticide chlorpyrifos—one of the pesticides discharged under the Permit—on food products. *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673 (9th Cir. 2021); *NRDC v. EPA (In re Pesticide Action Network N. Am.)*, 798 F.3d 809, 814 (9th Cir. 2015) ("EPA reported that chlorpyrifos poses such a significant threat to water supplies that a nationwide ban on the pesticide may be justified.").

Chlorpyrifos, an organophosphate, is only one of many pesticides used under the Permit. Other organophosphates used under the Permit include diazinon, malathion, and naled, and there are hundreds of other pesticides at issue. 4-ER-942–994. While the cases above do not examine pesticide impacts under the Clean Water Act, and the exposure pathways they discuss may differ from those at issue here, they establish ample documented concerns about human exposure to pesticides to warrant an actual evaluation by EPA.

EPA's failure to give human health any meaningful consideration is remarkable given that the Clean Water Act's central focus on water quality is, in no

small part, human health-based. *See* 33 U.S.C. § 1313(c)(2)(A) (water quality standards "shall . . . protect the public health or welfare"); *id*. at § 1317(a)(1) (EPA shall develop "list of toxic pollutants"); *id.* § 1314(a)(1) (EPA shall develop national recommended criteria for pollutants "reflecting the latest scientific knowledge . . . on all identifiable effects on health and welfare"); *id.* § 1313(c)(2)(B) (States "shall adopt criteria for all toxic pollutants listed pursuant to section 1317(a)(1) of this title for which criteria have been published under section 1314(a)."). EPA develops and revises recommended water quality criteria *specifically* for the protection of human health. *See e.g.*, 80 Fed. Reg. 36, 986 (June 29, 2015). Despite the statute's numerous requirements pertaining to human health and to toxic pollutants, EPA gives the issue almost no consideration. And given the overall lack of information available to the public because of the NOI, monitoring, and reporting flaws discussed above, the public is left largely in the dark about human health risks. *See* Maher Decl. at ¶¶ 11–13; Ukeiley Decl. ¶ 18, 21; Smith Decl. ¶ 14. EPA has thus failed to consider this "important aspect of the problem." *Waterkeeper All. v. EPA*, 140 F.4th 1193, 1220 (9th Cir. 2025).[13]

[13] Of course, while certain activities, like mosquito control, may ultimately benefit human health, that fact does not outweigh the necessity for EPA to thoroughly analyze the public health risks caused by exposure to highly toxic chemicals applied under this Permit.

### C. EPA Failed to Explain How the Permit Ensures Compliance with Water Quality Standards

*First*, EPA erroneously cites the environmental review process through FIFRA registration to suggest that the possible effects of NPDES-permitted discharges on water quality have already been evaluated and mitigated. 2-ER-286–292. But, as this Court has made clear, the analyses demanded by FIFRA and the Clean Water Act are radically different:

> FIFRA registration is a cost-benefit analysis that no unreasonable risk exists to man or the environment taking into account the economic, social and environmental costs and benefits of the use of any pesticide. In contrast, the granting of a NPDES permit under the CWA is not based on a cost-benefit analysis, but rather on a determination that the discharge of a pollutant satisfies the EPA's effluent limitations, imposed to protect water quality.

*Headwaters, Inc.*, 243 F.3d at 532 (cleaned up). Furthermore, "FIFRA's labels are the same nationwide, and so the statute does not and cannot consider local environmental conditions. By contrast, the NPDES program under the [Clean Water Act] does just that." *Id.* at 531; *see also* 3-ER-621 (NMFS expressing "concern because consultations on FIFRA labelling have identified discharges that result in population-level risks to ESA-listed species and designated critical habitat under NMFS' jurisdiction.").

A driving reason for the Permit's existence is that FIFRA labels *do not authorize* the discharge of pesticide pollutants into waters of the United States because the Clean Water Act forbids it. *See Nat'l Cotton Council*, 553 F.3d at 940.

Accordingly, EPA never considered the impacts of the discharges at issue from this Permit during the FIFRA registration process. Further, as discussed in *Headwaters, Inc.*, nationwide FIFRA labels do not ensure that NPDES-permitted discharges comply with local, site-specific water quality standards. *See* 243 F.3d at 532. FIFRA review is no substitute for Clean Water Act compliance. But EPA continues to beat that same drum. The agency is following the same reasoning that has been ruled unlawful by both this Circuit and the Sixth Circuit.

*Second*, EPA's argument that it lacks evidence of water quality problems from the current Permit, 2-ER-300, fails because the 2021 Permit shares the 2026 Permit's informational deficiencies. Both require a small minority of Operators to submit NOIs, fail to require adequate monitoring, and rely on self-reporting for adverse incidents. The failure of the 2021 Permit to bring any adverse incidents to light could just as easily be interpreted as an indictment of those features, which the 2026 Permit retains. Furthermore, EPA "cannot reasonably infer that the absence of evidence of" adverse incidents "equates to evidence of" none. *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009). This is particularly so given Operators' disincentive to report on themselves, especially because nobody else can effectively supervise their activities.

*Finally*, EPA's other excuses—"infeasibility of requiring ambient water quality data to demonstrate permit compliance" and a desire to avoid "undue burden

on permittees to have to gather and report detailed information on pest control practices," 2-ER-331—are disconnected from its Clean Water Act obligations and cannot justify its decision not to require permit terms to ensure compliance with water quality standards. *State Farm*, 463 U.S. at 43; *see also Campbell v. USDA*, 515 F. Supp. 1239, 1249 (D.D.C.1981) (Agencies cannot "choose not to implement their statutory mandate because they believe it is administratively inefficient or infeasible."). Moreover, these practicability hurdles are unfounded given that states have identified approaches for requiring more meaningful monitoring of pesticide discharges. *See, e.g.*, California State Water Resources Control Board Permit Nos. 2016-0041-DWQ, 2016-0040-DWQ, 2016-0039-DWQ, 2013-0002-DWQ (California pesticide general permits, requiring, *inter alia*, water quality sampling both before and after pesticide application).[14] By relying exclusively on visual monitoring, the Permit includes no measures to ensure that numeric water quality standards are being met. Its exception for when visual monitoring is not "feasible" makes even that weak requirement effectively optional and incapable of ensuring compliance with standards.

---

[14] *Available at*: https://www.waterboards.ca.gov/water_issues/programs/npdes/pesticides/

The Clean Water Act and EPA's regulations are abundantly clear: NPDES permits must ensure compliance with water quality standards. EPA cannot make that showing here, and the Permit is thus unlawful and arbitrary and capricious.

## IV. The Permit Creates a Sweeping Permit Shield and Prevents Enforcement

This Court has called it a "settled rule" that "[w]here a permittee discharges pollutants in compliance with the terms of its NPDES permit, the permit acts to 'shield' the permittee from liability under the [Clean Water Act]." *Puget Soundkeeper All. v. Port of Tacoma*, 104 F.4th 95, 105 (9th Cir. 2024) (quotations omitted). The Permit shields roughly 14,000 permittees from liability *if they comply with the permit terms*. But as we have discussed throughout this brief, the vast majority of these permittees will obtain that shield without providing any information about themselves or their discharges, and the information submitted by those who do submit NOIs and reports is woefully inadequate. EPA cannot oversee permittees' compliance under this scheme. *See* 3-ER-622 (NMFS biological opinion expressing concerns about EPA's ability to detect unlawful discharges and ensure compliance); 2-ER-427 (FWS biological opinion, same). Likewise, and of particular concern to the Center, the Permit is effectively unenforceable by citizens.

"Because the plain language of [33 U.S.C. § 1365] authorizes citizens to enforce all permit conditions, any violation of an NPDES permit can be remedied via citizen suit." *Californians for Alts. to Toxics v. Schneider Dock & Intermodal*

*Facility, Inc.*, 374 F. Supp. 3d 897, 911 (N.D. Cal. 2019) (cleaned up). The purpose of this provision is "to permit citizens to enforce the Clean Water Act when the responsible agencies fail or refuse to do so." *S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th Cir. 2007).

To bring such a lawsuit, citizens must provide notice that includes "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated;" describe "the activity alleged to constitute a violation;" and specify the "location of the alleged violation[,] . . . the person or persons responsible[,] . . . as well as the date or dates of the violation." *S.F. Baykeeper v. Levin Enters.*, 12 F. Supp. 3d 1208, 1222 (N.D. Cal. 2013). Typically, citizens use monitoring and reporting forms prepared by permittees and submitted to states or EPA. *See Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 826, 833 (9th Cir. 2021). But even outside of these data, enforcement actions also require basic information that is likewise not available here for at least 97% of permittees: the permittee's identity and how, when, and where they intend to discharge. These failings make it next to impossible to enforce this Permit.

Whereas the public could normally provide supplemental enforcement for an NPDES permit, the Permit essentially rules out that possibility by depriving everyone—regulator and citizen alike—of the information needed to ensure that the permit terms and water quality standards are complied with. A scheme under which

only 3% of authorized activity is known and basic discharge information from that 3% is absent does not comply with the Clean Water Act. *See Waterkeeper All.*, 399 F.3d 486, 503–04 (2d Cir. 2005) (vacating rule that "impermissibly compromise[d] the public's ability to bring citizen-suits").

The Clean Water Act creates a system that is fundamental to holding dischargers accountable and protecting the nation's waters. 33 U.S.C. §§ 1318(a), 1342(a)(2); 40 C.F.R. § 122.44(i)(1)–(2). EPA's issuance of the Permit turns this system on its head by allowing almost all permittees to escape basic notice and reporting obligations, while providing a permit shield and effectively ruling out enforcement. *See* 3-ER-622, 2-ER-427. This is unlawful, arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Permit is arbitrary and capricious within the meaning of the APA, and it fails to comply with the Clean Water Act. The Center respectfully requests that this Court remand the Permit to EPA with instructions to reissue a permit that complies with the Clean Water Act.

Dated this 13th day of January 2026.

Respectfully submitted,

s/*Allison LaPlante*
Allison LaPlante (OSB No. 023614)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374

Tel: (503) 980-3408
alaplante@biologicaldiversity.org

Hannah Connor (VSB No. 74785)
Benjamin Rankin (Cal. Bar No. 352371)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
T: (202) 681-1676 (Connor)
T: (202) 849-8402 (Rankin)
hconnor@biologicaldiversity.org
brankin@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-2738

I am the attorney or self-represented party.

**This brief contains** 13,916 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated [ ].
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Allison LaPlante **Date** 01/13/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*